UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANTIFUN LIMITED T/A PREMIUM VAPE,

Plaintiff,

-v-

WAYNE INDUSTRIES LLC and DOUGLAS RUTH,

Defendants.

22 Civ. 57 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This contract dispute involves vaping pods. Plaintiff Antifun Limited T/A Premium Vape ("Antifun") claims that it entered into two agreements with defendants Wayne Industries LLC ("Wayne") and its owner Douglas Ruth, under which they were to ship mango-flavored pods to Antifun in exchange for $48,000 and $93,559.50, respectively. Antifun claims that defendants failed to deliver the pods, falsely warranted that Ruth owned the pods, and made fraudulent misrepresentations that induced Antifun to enter into the agreements. Antifun brings claims of breach of contract, breach of express warranty, fraud, and unjust enrichment.

Defendants move now to dismiss Antifun's amended complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. They argue that Antifun fails to plead an enforceable contract, an express warranty, and fraud with particularity, and that the unjust enrichment claim improperly duplicates the contract breach claim.

For the reasons that follow, the Court grants in part and denies in part the motion to dismiss.

## I.      Background

### A.      Factual Background[1]

#### 1.      The Parties and Related Entities

Antifun is a company with its principal place of business in New Zealand.  AC ¶ 1.

Ruth is a Texas resident, Dkts. 27, 20 ¶ 1,[2] and the sole member of Wayne, a limited

liability company, Antifun Ltr.  Wayne is registered in Wyoming; its manager, Lisa Shultz, is a

Wyoming resident; and it does business in New York.  *Id.*; AC ¶ 2.

Non-party Kevin Mooney is Antifun's manager and a New Zealand resident.  AC ¶ 10;

Antifun Ltr.  Non-party Babylon is a Russia-based JUUL vaping pod distributor.  AC ¶ 14.  Non-

party Vardex is a Russia-based retailer that sells JUUL vaping pods.  *Id.*  Non-party Modern

Way Trade ("MWT") is a Russia-based company that sells JUUL vaping pods sourced from

Babylon and Vardex.  *Id.*  Non-party Vape House is a Ukraine-based JUUL vaping pod

distributor.  *Id.*, Ex. 8 at 4.  Non-party Fortuna Cigar is a Ukraine-based distributor of JUUL

vaping pods that sells such pods to Vape House.  *Id.*

---

[1] The facts are drawn primarily from Antifun's Amended Complaint, Dkt. 15 ("AC"), its attached exhibits, Ruth's declaration in support, Dkt. 20 ("Ruth Decl."), and Antifun's letter addressing diversity of citizenship, Dkt. 27 ("Antifun Ltr.").  *See DiFolco v. MSNBC Cable LLC,* 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  In deciding a motion to dismiss, the Court accepts all factual allegations in the AC as true and draws all reasonable inferences in Antifun's favor.  *See Koch v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d Cir. 2012).

[2] Although the AC pled that Ruth is a New York resident, Ruth's declaration and letter in response to the Court's inquiry as to Wayne's membership stated that he is a Texas resident. Ruth Decl." at ¶ 1; Antifun Ltr.

### 2.   April 24, 2020:  The Initial Contact Between the Parties, and Mooney's Sample Order

On April 24, 2020, Ruth initiated contact with Mooney through an "unsolicited" message on Facebook.  AC ¶ 10; *see id.*, Ex. 2.  Ruth asked if Antifun would be interested in a bulk purchase of 5% mango-flavored JUUL vaping pods, supplied directly from Russian and Ukrainian distributors.  AC ¶ 11; *id.*, Ex. 2.  Mooney expressed interest in discussing this further, and he and Ruth continued their conversation on WhatsApp.  AC ¶ 12; *id.*, Ex. 8.[3]

In their initial WhatsApp exchange, Ruth represented that he was based in New York City.  AC, Ex. 8 at 1.  He stated that, although he was "not in the [vaping] business directly," he worked with distributors shipping out of Kiev and Moscow.  *Id.* at 3.  Ruth also told Mooney that he sourced mango-flavored pods—the main subject of their initial exchange—from Russia through Babylon and Vardex, and from Ukraine through Vape House, a company receiving pods directly from Fortuna Cigar.  AC ¶ 14; *id.*, Ex. 8 at 4.  When Mooney asked for proof of the pods, Ruth sent a picture showing Canadian and Russian boxes of pods side by side, and offered to provide the associated invoices from the Russian and Ukrainian retailers.  AC, Ex. 8 at 4–5.  Ruth further stated that he relied on a freight forwarder to transport orders from Russia to Warsaw, from which commercial shipping across the world would be easier.  *Id.* at 5.  Mooney stated that, from Warsaw, Antifun could take over shipping on its DHL account.  *Id.* at 7.

Mooney and Ruth also discussed pricing.  Ruth stated that, for a price of $22–25 per box of mango-flavored pods, Mooney would need to order about 50 boxes per month.  *Id.* at 6–7.  In

---

[3] The AC does not allege, and Exhibit 8 does not indicate, the date of this exchange.  However, from Ruth and Mooney's discussion of New York City's having been "crazy [the] last 6 weeks" since the onset of the COVID-19 pandemic, AC, Ex. 8 at 1, and Ruth's expectation that matters would return to normal in "mid May," *id.* at 2, the Court infers that the exchange likely began on or shortly after April 24, 2020.

response, Mooney stated that, to achieve a satisfactory profit margin, he would need to buy at a price less than $17 per box. *Id.* at 7–8. Ruth responded that, due to "currency fluctuation" and shipping costs, only a much larger order quantity would enable him to consider a box price under $20. *Id.* at 8. At the end of this initial conversation, Mooney, to sample Ruth's products, placed a small order for mango-flavored pods. *Id.* at 8–9. Mooney sent payment directly to Ruth's PayPal account prior to shipment. AC ¶ 16. The sample then shipped to Antifun. *See id.*

In this initial WhatsApp exchange, Ruth did not mention his affiliation with Wayne. *Id.* ¶ 12.

### 3.    May–November 2020:  Antifun Places and Receives Further Orders from Defendants

Throughout 2020, after the completed sample order, Antifun placed other orders and paid for them via wire transfer. *Id.* ¶ 16.

On June 9, 2020, Mooney contacted Ruth on WhatsApp to place an order for 720 5% mango-flavored pods and 336 5% fruit-flavored pods. *Id.*, Ex. 5 at 1. Ruth responded: "Yes sir. I've plenty of Mango at the warehouse in Saint Petersburg. Everything but Mango is direct from the distributor so need to order that." *Id.*; *see also* AC ¶ 28. Ruth also sent Mooney pictures of boxes with the message: "We grabbed a crazy amount of Mango this week[.]" *Id.*, Ex. 5 at 3. He also stated that the non-mango-flavored pods in Mooney's order would take longer to deliver because they were not then in his inventory. *Id.* at 1. Mooney and Ruth agreed that the mango-flavored pods would be sent immediately, and the others when they were ready. *Id.* They then finalized the billing and shipping address details and Ruth sent Mooney two invoices, at least one of which displayed Wayne's logo. *Id.* at 2. Ruth requested that Mooney send a Material Safety Data Sheet ("MSDS form") to facilitate shipment. *Id.*

On September 11, 2020, Ruth, again on WhatsApp, messaged Mooney an Airway Bill for a recent shipment. AC, Ex. 7 at 1. According to Ruth, the bill showed that a shipment would depart from Moscow on September 13 via Etihad Airlines and arrive in Auckland, New Zealand on September 15 or 16. *Id.*; AC ¶ 13.

On October 8, 2020, Ruth asked that Antifun send partial payment for "this next order" directly to one of his or Wayne's creditors, which, he stated, was "mostly to keep a chunk of this payment off [his] U.S. account books" and to avoid sending an additional wire to the purchaser in Moscow. AC ¶¶ 16–18; *id.*, Ex. 6.

For every such order Antifun placed, Ruth sent an invoice marked with Wayne's—but not Ruth's—name. AC ¶ 18.

### 4.   November 2020–January 2021:  Shipment Delays

On November 24, 2020, Ruth and Mooney exchanged WhatsApp messages over issues regarding the shipment of a pending vaping pod order. *Id.*, Ex. 7 at 2. Ruth stated that the shipment was ready to leave Moscow's Sheremetyevo International Airport, but that Emirates was no longer running the flight they had planned to use to transport the pods. *Id.* Two days later, Ruth told Mooney that the order would be flown out the following Sunday or Monday. *Id.*

Around early January 2021, Ruth and Mooney discussed further shipping issues. *Id.* at 3. Ruth stated that he preferred to ship directly from Kiev because three-fourths of his shipments from Russia were stuck in customs due to the "Putin/Ukraine situation." *Id.* On January 6, 2021, Ruth messaged Mooney. He stated that DHL was requesting additional paperwork to complete a shipment, and suggested that Antifun contact its local DHL representative. *Id.*

### 5.   May–June 2021:  The Two Failed Orders

On May 5, 2021, Ruth sent Mooney a message offering Mango pods for $23 per pack, including shipping, to be sent by air freight or courier. AC ¶ 8; *id.*, Ex. 11 at 1. On May 6, 2021,

via WhatsApp, Ruth sent an invoice, dated December 16, 2020, for 2,087 packs of pods, in the amount of $48,000. AC, Ex. 12. The invoice, payable to an account in a China-based bank, left the beneficiary name field blank, and did not contain Wayne's or Ruth's name. *Id.* at 2. Mooney responded to that invoice with the message: "Thanks I'll get it paid and send receipt as usual." *Id.* at 1. On May 6, 2021, Antifun paid the $48,000. AC ¶ 6; *id.*, Ex. 1 at 1. Mooney and Antifun received only half of the 2,087 packs of pods. AC ¶ 15; *id.*, Ex. 12 at 1.

In June 2021, Antifun placed another order for 11,393 vaping pods of various flavors, for which Mooney received an invoice from Ruth, marked with Wayne's company name and logo, totaling $93,559.50. AC ¶ 9; *id.*, Ex. 3. Antifun paid that amount in two installments: on June 10, 2021, $65,118 to Shaoxing Jinping Trade Co., an account based in China, and on June 23, 2021, $28,441.50 to Wayne. AC, Ex. 1 at 2–3. Antifun did not receive any of the pods in the June 2021 order. AC ¶ 15.

As a result of the two unfulfilled orders, Antifun lost approximately $373,000 in revenue and $256,000 in profits. *Id.* ¶ 21. On October 14, 2021, Ruth told Antifun that he would personally pay restitution for its losses. *Id.* ¶ 32. However, Ruth and Wayne never delivered the outstanding pods or refunded any money to Antifun. *Id.* ¶¶ 15, 19–21.

### 6. February 2022: Antifun Discovers Ruth's Misrepresentations and Unpaid Debts to MWT

On February 23, 2022, Mooney learned that Ruth and Wayne had failed to timely pay $143,455 in debts it owed to MWT, its Russia-based supplier. *Id.* ¶ 23; *id.*, Ex. 4. As a result, MWT had refused to supply Ruth with the pods outstanding under Antifun's May 5, 2020 and June 2020 orders. AC ¶ 24. Ruth knew that MWT would not ship Antifun's orders because of those unpaid debts, but he misrepresented to Mooney that he could fulfill the orders. *Id.* Ruth

used Antifun's payments for the May and June 2021 orders to make good on its preexisting debts to MWT. *Id.* ¶ 25; *id.*, Ex. 4.

Mooney also learned from MWT that, in early 2022, Ruth had attempted to induce MWT to ship client orders by sending fake wire transfer bank receipts in support of his false claim that he was continuing to pay his debts. AC ¶ 26; *id.*, Ex. 4. As a result, MWT terminated its relationship with Ruth and stopped all shipments associated with him. AC ¶¶ 25–26; *id.*, Ex. 4.

Antifun also learned that Wayne did not have an apparent website or phone number, that the relationship between Ruth and Wayne was not documented on Ruth's LinkedIn or on Wayne's 2021 Annual Report, and that, without notifying Antifun, Wayne had apparently ceased operations. AC ¶¶ 33–35.

### B.     Procedural History

On January 4, 2022, Antifun filed the original complaint. Dkts. 1, 4 (filing error corrected). On March 10, 2022, Ruth and Wayne moved to dismiss and filed a memorandum of law, declaration, and exhibit in support. Dkts. 11–13. On March 30, 2022, Antifun filed the AC, the operative complaint here, and 12 exhibits. Dkt. 15. These included the parties' WhatsApp exchanges; messages between Antifun and MWT; records from Ruth's LinkedIn account; the 2021 LLC Annual Report for Wayne; bank wire records; and invoices. *Id.*

On May 5, 2022, defendants filed the instant motion to dismiss and a memorandum of law ("Mem."), declaration, and exhibit in support. Dkts. 18–20. On May 31, 2022, Antifun filed its opposition. Dkt. 23 ("Opp."). On June 20, 2022, Ruth and Wayne filed a reply. Dkt. 29 ("Reply").

## II. Applicable Legal Standards Governing Motions to Dismiss

### A. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010) (internal quotation marks omitted)). However, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's [*f*]actual allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*). A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

### B. Rule 9(b)

A claim sounding in fraud must also satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See Eternity Global Master Fund Ltd. v. Morgan Guar. Tr. Co. of*

*N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004); *Dover Ltd. v. A.B. Watley, Inc.,* 423 F. Supp. 2d 303, 327 (S.D.N.Y. 2006). Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To satisfy this Rule, a complaint alleging fraud must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016) (internal quotations omitted). In addition, a claim must "allege facts that give rise to a strong inference of fraudulent intent." *U.S. Cap. Partners, LLC v. Stanwich Cap. Advisors, LLC*, No. 14 Civ. 4138 (KPF), 2015 WL 4388421, at *3 (S.D.N.Y. 2015) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). "The requisite 'strong inference' of fraud may be established either [i] by alleging facts to show that defendants had both motive and opportunity to commit fraud, or [ii] by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).

## III.    Discussion

### A.    Breach of Contract Claim (Count One)

Antifun's breach of contract claim is that Ruth and Wayne failed to deliver pods for the orders it made and paid for in May and June 2021. In moving to dismiss, Ruth and Wayne argue that the AC fails to adequately allege: (1) mutual assent to form a contract; (2) sufficiently definite terms; (3) compliance with the statute of frauds; and (4) damages beyond the funds that Antifun paid defendants. Before reaching those arguments, the Court briefly addresses two threshold issues: whether (1) the New York Uniform Commercial Code ("N.Y. UCC"), or New York common law, governs this dispute, and (2) Antifun has pled sufficient facts to hold Ruth liable on this claim, via a veil-piercing theory.

9

### 1.    Does the New York UCC Apply?

Although the parties now appear to agree that the N.Y. UCC applies to this case, *see* Opp. at 6–7; Reply at 2–4, defendants' opening memorandum of law analyzed the breach of contract claim under New York common law, *see* Mem.  The Court accordingly addresses the governing law, which indeed is the N.Y. UCC.  The N.Y. UCC "applies to transactions in goods."  N.Y. UCC § 2-102.  Goods are "all things . . . which are movable at the time of identification to the contract for sale[.]"  *Id.* § 2-105(1).  As pled, the JUUL pods ordered for shipment by Antifun clearly so qualify.

This dispute is, in any event, of little moment, as the relevant elements of the N.Y. UCC and the common law claims are generally synchronous.  Under the common law, a cause of action for breach of contract requires "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages."  *DeFlora Lake Dev't Assocs., Inc. v. Park*, 654 F. App'x 9, 10 (2d Cir. 2016) (summary order) (citation omitted).  This test "is the same as that under the N.Y. UCC."  *Saint Paul Commodities, LLC v. Island Biofuel, LLC*, No. 12 Civ. 3108 (DRH) (AKT), 2013 WL 3874447, at *5 (E.D.N.Y. July 25, 2013); *see also Clopay Plastic Prod. Co. v. Excelsior Packaging Grp., Inc.*, No. 12 Civ. 5262 (JPO), 2014 WL 4652548, at *4 (S.D.N.Y. Sept. 18, 2014).

In only one respect do the two bodies of law appear to differ as applied here.  Because the alleged contract covers goods valued at more than $500, the N.Y. UCC, unlike the common law, allows defendants to raise a statute of frauds defense.  *See* N.Y. UCC § 2-201; discussion *infra*, Section III.A.3.iii.  And when the two bodies of law yield contrary results, the N.Y. UCC displaces the common law.  *See PCS Sales (USA), Inc. v. Nitrochem Distrib. LTD.*, No. 03 Civ. 2625 (SAS), 2004 WL 944541, at *3 (S.D.N.Y. May 3, 2004), ("Disputes arising from a contract

for the sale of goods are governed by New York's Uniform Commercial Code . . . 'as interpreted in light of common law principles to the extent [those principles are] not inconsistent with [N.Y.] U.C.C.'"), *aff'd*, 128 F. App'x 817 (2d Cir. 2005) (summary order); *McNally Wellman Co. v. N.Y. State Elec. & Gas Corp.*, 63 F.3d 1188, 1196 (2d Cir. 1995); N.Y. UCC § 1-103(b).

### 2.    May Ruth Be Held Liable?

Antifun argues that Ruth is directly liable, and in the alternative, that, on the facts alleged, Wayne's corporate veil should be pierced.  AC ¶¶ 37–41.  In moving to dismiss, Ruth and Wayne counter that the facts pled do not permit veil-piercing.  Based on the pleadings, Antifun's claim against Ruth on this theory may proceed.

The parties agree that, because Wayne is a Wyoming LLC, Wyoming law governs the issue of veil-piercing.  *See* Mem. at 14; Opp. at 11.  Under Wyoming law, "[t]he veil of a limited liability company may be pierced under exceptional circumstances when: (1) the limited liability company is not only owned, influenced and governed by its members, but the required separateness has ceased to exist due to misuse of the limited liability company; and (2) the facts are such that an adherence to the fiction of its separate existence would, under the particular circumstances, lead to injustice, fundamental unfairness, or inequity." *GreenHunter Energy, Inc. v. W. Ecosys. Tech., Inc.*, 337 P.3d 454, 462 (Wyo. 2014) (citing authorities).  The veil-piercing inquiry is "fact-driven and flexible, and it focuses on whether the limited liability company has been operated as a separate entity as contemplated by statute, or whether the member has instead misused the entity in an inequitable manner to injure the plaintiff." *Id.* at 463; *see also Kaycee Land & Livestock v. Flahive*, 46 P.3d 323, 325 (Wyo. 2002) ("Wyoming courts, as well as courts across the country, have typically utilized a fact driven inquiry to determine whether circumstances justify a decision to pierce a corporate veil."); *Atlas Constr. Co. v. Slater*, 746 P.2d 352, 356 (Wyo. 1987) ("[C]ourts must . . . consider many varying factors relevant to their

deliberations."). To pierce the veil, a court must find some combination of fraud,[4] inadequate capitalization, and an improper degree to which funds of the company and the individual are intermingled. *GreenHunter Energy*, 337 P.3d at 463–64. "[W]hen the LLC has caused damage and has inadequate capitalization, co-mingled funds, diverted assets, or [was] used . . . as a mere shell," individual members should not be held immune from liability, even if there was no fraud alleged. *Kaycee Land*, 46 P.3d at 328.

Here, although an ultimate determination of this issue awaits factual development, the AC's allegations as to both Wayne's undercapitalization and Ruth's intermingling of funds are sufficient to enable the claims against Ruth to proceed.

As to Wayne's undercapitalization, the AC pleads that Ruth used Antifun's payments to pay off its preexisting debts, rather than to pay for the pods Antifun had ordered. AC ¶ 17 (Ruth's payments to Wayne's creditors used money Antifun had paid towards orders that Wayne never filled); *see also id.*, Ex. 1 at 1–2. As pled, Antifun began paying Wayne's creditors as early as October 2020. AC ¶ 16. In May 2021 and June 2021, Antifun paid $48,000 and $65,118, respectively, directly to Chinese banks. *Id.*, Ex. 1 at 1–2. At the time, Wayne was so strapped for cash that it was "in default on its obligations to its supplier." AC ¶ 23. *Cf. Gasstop Two, LLC v. Seatwo, LLC*, 225 P.3d 1072, 1077–78 (Wyo. 2010) (undercapitalization not found where LLC operated at a loss for two years, but was able to make rent payments and attributed loss to reasons other than undercapitalization). Ruth and Wayne, at this stage, have not provided an alternative explanation for these seeming irregularities.[5]

---

[4] A finding of fraud alone may justify piercing the limited liability veil. *GreenHunter Energy*, 337 P.3d at 464.

[5] The pleadings thus make this case distinct from Wyoming cases finding undercapitalization not properly alleged. *Atlas Constr. Co.*, 746 P.2d at 356–57 ("For example, if the corporation was

Further, by the time Mooney learned of Wayne's unpaid obligations, they had grown to

$143,455.  AC, Ex. 4.  On the facts pled about Wayne, a one-person outfit handling vaping

orders on, apparently, an ad hoc basis, this debt is plausibly viewed as significant.  *See*

*GreenHunter Energy*, 337 P.3d at 463–64 ("[S]ome businesses need a great deal of capital,

others very little.").  And where an LLC's "members have never attempted to make

arrangements to secure sufficient capital, these facts may be evidence that the company was used

to screen members from legitimate debt because it is not in reality an autonomous company

capable of carrying on its own business." *Id.* at 463.  Although the facts pled pre-discovery as to

Wayne's efforts to raise capital necessarily are limited, the pleadings do not indicate that such

efforts were made, and imply that they were not.

The AC also pleads that Wayne's liquidity problems were persistent.  In February 2022,

MWT stated that "there were more orders than money sent," and that, because "the money did

not arrive for a long time, [they] stopped sending the goods" and ended their relationship with

Ruth. AC, Ex. 4 at 1.  And there were indications that most payments received by Wayne were

used to cover past orders.  *See id.* at 2 ("We could receive money from you, and send orders to

another client . . . . We did not receive any money from [Ruth]."); AC ¶ 25.  On these pleadings,

the inference is plausible that Wayne was undercapitalized, and, out of funds and unable to pay

its supplier for past transactions, used customer payments intended to pay for new orders to

cover historical debts. *Atlas Constr. Co.*, 746 P.2d at 356 ("courts must pay heed to the . . . time

periods involved" as a factor in analyzing capitalization).

---

started with an adequate level of assets which thereafter became inadequate the court must then
delve into the factors causing the decline.").

The AC also plausibly pleads the intermingling of Ruth's and Wayne's funds. The AC pleads that Antifun made its original payment, via PayPal, directly to Ruth, as Ruth had directed. AC ¶ 16; *id.*, Ex. 8 at 9. Further, on October 8, 2020, Ruth directed Mooney to wire "partial payment" to an account at a Chinese bank; Ruth explained that he wished to "keep a chunk of this payment off *my* US account books[.]" AC, Ex. 6 (emphasis added). And, on October 14, 2021, Ruth told Antifun that he would personally repay Antifun for their losses on the contract. AC ¶ 32. Those statements support Antifun's claim that Ruth intermingled personal and LLC funds and that he believed he was financially responsible for Antifun's loss. *See GreenHunter Energy*, 337 P.3d at 464 ("Funds and assets should be separated and not commingled.").

Other facts pled support the inference that Ruth "used [Wayne] as a mere shell." *Kaycee Land*, 46 P.3d at 328. Ruth initially held himself out as a private individual who conducted business with his distributors directly. *See* AC ¶ 12. In messages to Antifun's Mooney, Ruth referred to his personal ability to secure vaping pods. AC Exs. 2 ("I can supply[.]"), 5 at 2 ("I have a 2k order minimum with the distributor[.]"), 8 at 3 ("[O]nce I saw the writing on the wall I started to setup a distribution channel in Kiev and Moscow."), 8 at 4 ("I buy directly from Babylon and Vardex . . . coordinated with Vape House to give myself effectively 2 markets to pull product from."), 8 at 6 ("I can source any of the flavors[.]"). Wayne did not surface until later in Ruth's dealings with Mooney, when Wayne's logo began appearing on the invoices Ruth sent. AC ¶ 12; *see also id.* ¶ 33 (Wayne did not have its own website or phone number).

Finally, Antifun plausibly alleges a high probability that Wayne has ceased operations. AC ¶ 35. If true, dismissing Ruth at the threshold based on "adherence to the fiction of [Wayne's] separate existence" would appear to leave Antifun unable to recover, and thus cause "injustice, fundamental unfairness, or inequity." *GreenHunter Energy*, 337 P.3d at 462.

14

These assembled allegations plausibly plead a basis for piercing Wayne's veil. The contract breach claim therefore may proceed against Ruth to the extent it does against Wayne.

### 3.    Defendants' Challenges to this Claim

#### a.  *Mutual assent and consideration*

Defendants argue that the AC fails to allege the existence of a contract or mutual assent to it. That argument is easily put aside.

Under the UCC, "a contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." N.Y. UCC § 2-204(1); *see also Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 378 F. Supp. 2d 377, 389 (S.D.N.Y. 2005); *Dayton Superior Corp. v. Marjam Supply Co.*, No. 07 Civ. 5215 (DRH) (WDW), 2011 WL 990300, at *7 (E.D.N.Y. Feb. 22, 2011). "The manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019) (citations omitted). "In determining whether the parties entered into a contractual agreement . . ., it is necessary to look . . . to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *223 Sam, LLC v. 223 15th St., LLC*, 161 A.D.3d 716, 717–18 (N.Y. App. Div. 2018) (citing *Gallagher v. Long Is. Plastic Surgical Grp., P.C.*, 113 A.D. 3d 652, 653 (N.Y. App. Div. 2014)).

Here, the facts alleged are more than sufficient to plead the parties' objective manifestation of mutual assent for the May and June 2021 orders. For the May 2021 transaction, Ruth contacted Mooney, stating: "We have an option on 2k Mango 4 from UA if you are interested . . . $23 shipped." *Id.* Ex. 11 at 1. Within two hours, Mooney responded: "[Y]es please I'll take them," after which Ruth sent an invoice "for 2,087 packs." AC, Exs. 11; 12 at 1. They proceeded to discuss shipping details. For the June 2021 transaction, Mooney ordered

11,393 vaping pods in different flavors, for which Ruth sent an invoice for $93,559.50 with

Wayne's name and logo on it. AC ¶ 9; *id.*, Ex. 3. For both undelivered orders, Ruth and Wayne

thus sent invoices to Antifun representing that they would deliver goods in exchange for

compensation. AC, Exs. 3 (detailed invoice for June 2021 order), 12 at 2 (titled "invoice for

goods"); *Gallo Wine Distribs., L.L.C. v. Niebaum-Coppola Est. Winery, L.P.*, 56 F. App'x 8, 10

(2d Cir. 2003) (summary order) (invoices sufficient evidence that contracts were formed);

*Quality Packaging Supply Corp. v. R.H. Carlson Co.*, 158 A.D.2d 936 (N.Y. App. Div. 1990)

(invoice evidenced a contract under the N.Y. UCC).

Were there any doubt as to the adequacy of the AC's pleadings on this point, the parties'

dealings prior to the May and June 2021 unconsummated orders reinforce the plausibility of the

claim of mutual assent. *223 Sam, LLC*, 161 A.D.3d at 717–18. Antifun alleges that Mooney, on

its behalf, earlier had placed, and successfully received, similar orders for pods with Wayne, as

memorialized in contemporaneous invoices. This history reinforces the inference that, as pled,

Antifun and Wayne agreed to and anticipated a purchase and delivery of pods in May and June

2021 consistent with the pattern of Antifun's requests and the recent invoices. AC ¶ 16; *see also

id.*, Ex. 7 at 1–2 (September and November 2020 conversations about orders); *see also Potamkin

N.Y., LP v. Gem Auto Brokers Inc.*, No. 11 Civ. 6515 (JGK) (GWG), 2012 WL 1898896, at *3

(S.D.N.Y. May 1, 2012) (shipments constituted mutual assent to terms of corresponding orders

and an intent to be bound), *report and recommendation adopted*, 2012 WL 1870949 (S.D.N.Y.

May 23, 2012). The parties' prior dealings had also addressed issues collateral to these orders,

including credit for shipments based on lower-than-expected shipping costs, *see* AC, Ex. 7 at 1

(WhatsApp messages from September 11, 2020 between Ruth and Mooney), and the

consequences of delays in shipping, *see id.* at 2 (messages on November 24 and 26, 2020

between Ruth and Mooney). These communications implicitly bespeak the participants'

understanding that they had mutually agreed to the prior orders.

Finally, the AC plausibly pleads consideration for both transactions. "Under New York

law, all contracts must be supported by consideration, defined simply as 'a bargained-for

exchange of promises or performance.'" *In re Vargas Realty Enters., Inc.*, 440 B.R. 224, 236

(S.D.N.Y. 2010). Here, the AC alleges that payment for the pods would be sent by Antifun

either via PayPal to Ruth, wire to Wayne, or wire to Wayne's creditors, AC ¶¶ 16–17, with the

recipient being Wayne (or its sole member, Ruth). The AC further pleads that in addition to

agreeing on consideration, Antifun paid substantial amounts in consideration—for the first

unfulfilled order, $48,000 to a creditor, and for the second, $93,559, divided between Wayne and

a creditor. *Id.*, Ex. 1.

### b.   *Material terms*

Ruth and Wayne next argue that the AC does not allege facts sufficient to establish the

material terms of the parties' May and June 2021 agreements. That, too, is wrong.

Defendants are imprecise as to which terms are, purportedly, inadequately alleged. *See*

Mem. at 7 (stating only that AC fails to recite defendants' "purported obligations . . . to

[p]laintiff" or to "provide any details of this so-called 'contract'"). "In contract law, 'essential

terms' are those terms that are necessary in order to lend an agreement sufficient detail to be

enforceable by a court." *Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51, 58 (2d Cir. 2017), *as

amended* (Aug. 21, 2017) (citation omitted) (applying New York law). "For example, a contract

for the sale of goods must contain terms such as the quantity of goods to be sold and the price at

which they will be purchased." *Id.* But as a general rule, "[w]hether there has been a meeting of

the minds on all essential terms is a question of fact that must be resolved by analyzing the

totality of the circumstances." *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F.

Supp. 2d 329, 337 (S.D.N.Y. 2006) (citing cases).  And under the N.Y. UCC, "if the parties have

intended to contract, and if an appropriate remedy may be fashioned, a contract for sale does not

fail for indefiniteness if terms, even important terms, are left open." *Alessi Equip., Inc. v. Am.

Piledriving Equip., Inc.*, No. 18 Civ. 3976 (JCM), 2022 WL 63165, at *11 (S.D.N.Y. Jan. 6,

2022) (quoting *Kleinschmidt Div. of SCM Corp. v. Futuronics Corp.*, 363 N.E.2d 701 (N.Y.

1977)); *see also* N.Y. UCC § 2-204.

    Ruth and Mooney's agreement for the sale of vaping pods, as pled, covers the material

terms required under this standard.  Over the course of the relationship, for every order except

the May 2021 order, as pled, Ruth and Wayne sent Antifun an invoice setting out the central

terms of the transaction—including price, quantity, shipping addresses, and billing information.

*See* AC ¶ 18 ("See Exhibit 3 for one example of an invoice sent."); *id.*, Ex. 3; *see also Gallo

Wine*, 56 F. App'x at 10 (invoices were final discrete contracts independent of an underlying

distribution agreement).

    For the May 2021 order, the invoice, titled "Invoice for Goods," contained information

about the payee only.  AC, Ex. 12 at 2.  But, as pled, the messages preceding the invoice

plausibly filled that void.  They set out the price term ($23 per box), the number of packs

(2,087), and certain shipping details.  *Id.*, Exs. 11, 12 at 1.

    For the June 2021 transaction, the order invoice was on Wayne's letterhead, dated, and

contained the billing, shipping, and seller addresses.  AC, Ex. 3.  Each item had a description, a

quantity, a unit price, and a subtotal.  *Id.*  The final total was included, as was the payment

method and payee details for Wayne.  *Id.*  The material terms of the transaction were thus

articulated.  *See Quality Packaging Supply Corp.*, 158 A.D.2d at 936 (invoice was contract under

N.Y. UCC); *Battista v. Radesi*, 112 A.D.2d 42 (N.Y. 1985) (invoice with names and address of parties, date, payment terms, a description and price of items, and total price was final expression of parties' contract); *see also Matthew Bender & Co. v. Jaiswal*, 93 A.D.2d 969 (N.Y. App. Div. 1983).[6]

The AC thus adequately pleads an agreement on material terms between Antifun and Wayne.  AC ¶¶ 6–9.

### c.  *Statute of frauds*

For sales of goods over $500, the UCC requires "some writing sufficient to indicate that a contract for sale has been made . . . and signed by the party against whom enforcement is sought." N.Y. UCC § 2-201(1); Reply at 2.  The writing need not contain all material terms, but the quantity of the goods shown in the writing will be treated as the final amount. N.Y. UCC § 2-201(1).[7]

Here, although the AC does not allege a formal written contract, it alleges facts that adequately plead compliance with the statute of frauds.

---

[6] In their WhatsApp exchanges, too, as pled, Ruth and Mooney agreed upon price and quantity terms, among others, including the authenticity of the pods and shipping details.  *See* AC ¶ 8 (goods would be "shipped via air freight or courier ASAP after payment"); *id.*, Ex. 8 at 5–7.

[7] Wayne raised its statute of frauds argument for the first time in the reply.  While "[g]enerally, a court does not consider issues raised in a reply brief for the first time," *Sacchi v. Verizon Online LLC*, No. 14 Civ. 423 (RA), 2015 WL 1729796, at *1 n.1 (S.D.N.Y. Apr. 14, 2015) (brackets and internal quotations omitted), the "Second Circuit has made it abundantly clear that a district court has discretion to consider a belatedly-raised argument, and that a judge's decision to countenance such argument will be reviewed for abuse of discretion," *In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472, 485 (S.D.N.Y. 2017) (emphasis in original) (citing *Am. Hotel Int'l Grp., Inc v. OneBeacon Ins. Co*, 611 F. Supp. 2d 373, 375 (S.D.N.Y. 2009)), *modified*, No. 12 Misc. 381 (WHP), 2017 WL 564676 (S.D.N.Y. Feb. 13, 2017).  Here, the Court chooses to consider the argument, and rejects it.

First, for agreements between merchants, unsigned writings can satisfy the statute of frauds's writing requirement. "Between merchants, if within a reasonable time a writing in confirmation of the contract . . . is received and the party receiving it has reason to know its contents, it satisfies the requirements . . . unless written notice of objection to its contents is given within ten days after it is received." N.Y. UCC § 2-201(2).[8] "There are no rigid requirements as to the form or content of a confirmatory writing. A writing is sufficient so long as it affords a basis for believing that it reflects a real transaction between the parties." *Hilord Chem. Corp. v. Ricoh Elecs., Inc.*, 875 F.2d 32, 37 (2d Cir. 1989). Invoices—signed or unsigned—can serve as writings confirming an agreement, satisfying N.Y. UCC § 2-201(1). *B & R Textile Corp. v. Domino Textiles Inc.*, 77 A.D.2d 539, 539–40 (N.Y. App. Div. 1980) (invoice constituted a "writing in confirmation of the contract" when it was on letterhead and contained names and addresses of buyer and seller, date, payment terms, prices of goods, description of goods, amount of goods, and total price of sale); *Rienzi & Sons, Inc. v. I Buonatavola Sini S.R.L.*, No. 20 Civ. 5704 (ERK) (SJB), 2021 WL 5013795, at *3 (E.D.N.Y. Oct. 28, 2021); *Quality Packaging Supply Corp.*, 158 A.D.2d at 936 (invoice was contract under N.Y. UCC § 2-201(2)). Electronic communications between merchants—provided that they are sufficiently precise—can also serve as writings confirming an agreement. *E. Mishan & Sons, Inc. v. Homeland Housewares, LLC*, No. 10 Civ. 4931 (DAB), 2012 WL 2952901, at *5

---

[8] On the facts pled, the parties were merchants dealing in vaping pods. The N.Y. UCC defines a merchant as, among other things, "a person who deals in goods of the kind or otherwise by his occupation." N.Y. UCC § 2-104; *Galin v. Hamada*, 283 F. Supp. 3d 189, 195 (S.D.N.Y. 2017) (art dealer selling paintings was merchant), *aff'd*, 753 F. App'x 3 (2d Cir. 2018) (summary order); *Rotunda v. Haynes*, 33 Misc. 3d 68, 70 (N.Y. App. Div. 2011) (private dog breeder was merchant). As pled, Antifun (which sold pods for a profit) and Wayne (which had multiple pod-buying clients) were all merchants dealing in JUUL pods. *See, e.g.*, AC, Ex. 11 at 1 (Ruth messaged Mooney offering pods discounted from the price he offered another client, Mooney responded that the pods would "no doubt sell at the new price").

(S.D.N.Y. July 16, 2012) (email specifying price and quantity terms, effective dates, and conditions precedent for alteration was a confirmatory writing); *Bazak Int'l Corp.*, 378 F. Supp. 2d at 384–85 (electronic form of a writing that contains a quantity term does not preclude enforcement of an underlying agreement).

Here, the AC alleges that Wayne sent Antifun messages and invoices memorializing the May and June 2021 agreements. AC ¶¶ 6–9; *id.*, Exs. 3, 11–12. The May 2021 messages provide a plausible, written basis to believe that the parties came to an agreement. Wayne and Antifun agreed on the quantity of pod packs—2,087—the only term required under the N.Y. UCC, AC, Ex. 12 at 1; *see Bazak Int'l Corp.*, 378 F. Supp. 2d at 386 ("quantity is the only contractual term specifically required under the UCC"), as well as the price per pack—$45, AC, Ex. 11 at 2. The payee's name and account details, as well as the total amount due, are also included on the invoice Ruth sent to Mooney. AC, Ex. 12. As to the June 2021 agreement, the invoice comprehensively recites the terms of the agreement. AC, Ex. 3. The invoice was on Wayne's letterhead. And it set out the buyer's and seller's names and addresses, the date, wire details, unit prices for each item, item descriptions, quantities, subtotals, and the total amount due. *Compare B & R Textile Corp.*, 77 A.D.2d at 539 *with* AC, Ex. 3.

Second, and independently, partial performance is an exception to the writing requirement, provided that payment has been made and accepted. *See* N.Y. UCC § 2-201(3)(c). "[T]he weight of authority is clearly to the effect that [partial] payment will render an indivisible oral contract enforceable, notwithstanding the Statute of Frauds." *Songbird Jet Ltd., Inc. v. Amax, Inc.*, 581 F. Supp. 912, 923 (S.D.N.Y. 1984) (quoting *Thomaier v. Hoffman Chevrolet, Inc.*, 64 A.D.2d 492, 495–96 (N.Y. 1978)); *Seven Seas Trading Co. v. Nan Hong Farm, Inc.*, No. 96 Civ. 7249 (SS), 1997 WL 370590, at *2–3 (S.D.N.Y. July 1, 1997) (contract enforceable to

extent of performance); *Starr v. Freeport Dodge, Inc.*, 282 N.Y.S.2d 58, 59–61 (N.Y. Cnty. Dist. Ct. 1967) ($25 down payment on car sufficient to prove existence of a contract).

Here, as to both the May and June 2021 orders, the AC alleges not just partial, but full, performance by Antifun. The wire transfers attached to the AC reflect that, for both unfilled orders, Antifun made full payment—on May 6, June 10, and June 23, 2021. AC ¶¶ 6–9; *id.*, Ex. 1. For purposes of evaluating the adequacy of the pleadings, that makes the terms of the May 2021 and June 2021 orders enforceable to the extent of performance, and thereby obviates the need for a writing consistent with the statute of frauds.

### d. *Damages*

In a final, partial, challenge to the breach of contract claim, defendants argue that the AC, to the extent it seeks lost profits, seeks damages that are non-cognizable. The AC alleges that Antifun lost $373,000 in revenue and $256,000 in profits—apparently on a theory of expectation damages. AC ¶¶ 20 ("Defendants . . . knew or should have known that [Antifun] would lose profit by not receiving the pods."), 21 ("[Antifun] lost approximately $373,000.00 in revenue and $256,000.00 in profit *as a result of not receiving the pods*." (emphasis added)). *See Afolabi v. Jones*, No. 06 Civ. 2756 (RJD) (MDG), 2008 WL 4890166, at *4 (E.D.N.Y. Nov. 12, 2008) (where plaintiff "expected to sell" undelivered products, lost profits were the appropriate measure of damages). Defendants argue that lost profits are unavailable; damages should be limited to the amount that Antifun wired specifically to Wayne—$28,441.50—and should not include Antifun's lost profits or amounts that Ruth directed Mooney to wire to Chinese bank accounts; and the damages calculated by Antifun are mathematically incorrect and speculative. Mem. at 7–8.

To adequately allege lost-profit damages, a complaint must plead the "existence and amount of such damages with reasonable certainty." *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) (citing *Kenford Co. v. Erie Cnty.*, 493 N.E.2d 234, 235 (N.Y. 1986)). "Although lost profits need not be proven with 'mathematical precision,' they must be 'capable of measurement based upon known reliable factors without undue speculation.'" *Id.* (quoting *Ashland Mgmt. Inc. v. Janien*, 624 N.E.2d 1007, 1010 (N.Y. 1993)). Once so established, the plaintiff "must prove that lost profit damages were within the contemplation of the parties when the contract was made." *Id.* (citing *Ashland Mgt.*, 624 N.E.2d at 1010).

The AC pleads facts satisfying both prongs of this standard. The AC alleges the number of pods undelivered, AC ¶ 15 ("Defendants only shipped half of the pods for the May payment, and failed to ship any pods to Premium for the June payment"), *id.*, Exs. 3 (quantity totals to 11,393), 12 at 1 ("[f]or 2,087 packs"); the purchase price of each pod, AC, Exs. 3, 11–12; and the fact that Antifun intended to sell the pods at a markup, AC ¶ 20 (Antifun "intended to sell the pods"). The AC also alleges an approximate markup.[9] *See id.*, Ex. 11 at 2 (Ruth messages: "end users are now paying $45 per pack and they still can't keep them in stock!"). The AC also adequately alleges, contrary to defendants' contention, that lost profit damages were within the contemplation of both parties at contract formation. *Id.* ¶ 20. In his earliest WhatsApp messages about pricing, Mooney discussed Antifun's anticipated profit margin on the pods, *id.*, Ex. 8 at 7–8 ("We'd be pushing it to sell any real volume at that price . . . doesn't leave any margin."), and made clear that he was purchasing the pods for resale, as opposed to personal use. AC ¶ 20; *id.*, Ex. 8 at 2 ("[V]ape online has been classed as an essential service so we have traded right

---

[9] Taking the number of pods alleged to be undelivered (12,436) and the total alleged revenue loss ($373,000), the average retail price per pod alleged is approximately $30, below the expected retail price ($45) in Ruth's messages around the same time. AC, Exs. 3, 11–12.

through[.]"), 4 ("We have zero tolerance for counterfeits as it is obviously detrimental to our business."). The point was reiterated in the exchanges between the men in connection with the May 2021 order. On May 5, 2021, Ruth messaged Mooney to offer 2,000 packs of Mango 4 at "$23 shipped." AC, Ex. 11 at 1. Mooney accepted, stating, "they'll no doubt sell at the new price." And Ruth replied that "end users are now paying $45 per pack" before sending an invoice. *Id.* at 1–2. *See, e.g., Afolabi*, 2008 WL 4890166, at *4 (lost profits appropriate where plaintiff "expected to sell" undelivered products); *Billion Tower Int'l, LLC v. MDCT Corp.*, No. 08 Civ. 4185 (LAK) (JLC), 2010 WL 5536513, at *8 (S.D.N.Y. Dec. 10, 2010), *report and recommendation adopted*, 2011 WL 43458 (S.D.N.Y. Jan. 6, 2011) (where defendant knew that plaintiff was "an entity in the business of reselling the goods", lost profits were in contemplation at the time of formation); N.Y. UCC § 2-715, cmt. 6 ("In the case of sale of wares to one in the business of reselling them, resale is one of the requirements of which the seller has reason to know[.]").

Defendants' counter-arguments are insufficient to secure dismissal.

First, contrary to defendants' claim that Antifun's damages should be limited to the amount of the funds it wired to Wayne, the AC adequately alleges an agreement that made Wayne responsible for furnishing to Antifun the vaping pods that it ordered for purposes of later resale. *See, e.g.,* AC ¶¶ 15–18. Defendants do not cite any case authority under which the expectation damages ordinarily available for a merchant in this situation, *see Canusa Corp. v. A & R Lobosco, Inc.*, 986 F. Supp. 723, 731–33 (E.D.N.Y. 1997), would be unavailable to Antifun. *See Afolabi*, 2008 WL 4890166, at *4 ("Under the UCC, the measure of damages for non-delivery of goods by a seller includes incidental and consequential damages incurred, but less expenses saved in consequence of the seller's breach."); *Billion Tower Int'l, LLC*, 2010 WL

5536513, at *8; *Saint Paul Commodities,* 2013 WL 3874447, at *7.  And on the pleadings,

Antifun has adequately alleged that lost profits, *i.e.* expectation damages, not restitution—are

appropriate.

Second, contrary to defendants' claim, the AC's lost profits calculation is not improperly

speculative.  The AC pleads the approximate values of Antifun's lost revenue as $373,000 and,

from that, its lost profits of $256,000.  AC ¶ 21.  For pleading purposes, these allegations suffice,

*V.S. Int'l, S.A. v. Boyden World Corp.,* No. 90 Civ. 4091 (PKL), 1993 WL 59399, at *6

(S.D.N.Y. Mar. 4, 1993), and Antifun's tabulations appear consistent with the invoices and wire

receipts attached to the AC, *see* AC, Exs. 1, 3, 12 at 2.  Defendants, of course, will be at liberty,

at summary judgment and/or trial, to challenge these calculations.

The Court accordingly denies the motion to dismiss the breach of contract claim.

**B.    Breach of Express Warranty Claim (Count Two)**

Count Two, breach of express warranty, is brought against Ruth only.  The AC alleges

that Ruth falsely warranted that he owned the pods that he offered to sell Antifun.  *Id.* ¶ 42.  In

moving to dismiss, Ruth argues that this statement was not a warranty about the products; that

the assertedly fraudulent statement is not pled with particularity; and that the AC fails to

adequately allege reliance.  Mem. at 12–13.  The Court agrees that Antifun has failed to properly

allege reliance.  Dismissal of this claim is therefore in order.

Under N.Y. UCC § 2-313(1), "[a]ny affirmation of fact or promise made by the seller to

the buyer which relates to the goods and becomes part of the basis of the bargain creates an

express warranty that the goods shall conform to the affirmation or promise."  N.Y. UCC § 2-

313(1).[10]  To state a claim for breach of warranty, a complaint must allege: "(1) the existence of

---

[10] Antifun alleges a cause of action under N.Y. UCC § 2-213, which does not exist.  The Court
agrees with defendants that this, in all likelihood, was a typographical error.  Mem. at 12 n.3.

a material statement amounting to a warranty, (2) the buyer's reliance on this warranty as a basis for the contract with the immediate seller, (3) breach of the warranty, and (4) injury to the buyer caused by the breach." *Housey v. Procter & Gamble Co.*, No. 21 Civ. 2286 (NRB), 2022 WL 874731, at *3 (S.D.N.Y. Mar. 24, 2022).

Here, the AC's breach-of-warranty claim does not relate to the pods being sold, but to Ruth's representation that he owned the pods. *See* AC ¶¶ 28 ("Yes sir. I have plenty of Mango at the warehouse in Saint Petersburg," and "We grabbed a crazy amount of Mango this week." (quoted from Ex. 5)), 42. An "affirmation of fact or promise made by the seller to the buyer which relates to the goods," amounting to a warranty, N.Y. UCC § 2-313(1), can be properly styled as a breach of warranty of title claim under N.Y. UCC § 2-312. "Section 2–312 of [the N.Y. UCC] establishes a warranty of good title in every contract for sale of goods." *Zaretsky v. William Goldberg Diamond Corp.*, No. 14 Civ. 1113 (SAS), 2014 WL 4160232, at *1 (S.D.N.Y. Aug. 18, 2014). The adequacy of these allegations is a close question. On the one hand, the exhibits containing screenshots of those statements establish with specificity when and where those statements were made. *Cf. Viania v. Zimmer, Inc.*, No. 17 Civ. 1641 (ADS) (AYS), 2017 WL 5714725, at *5 (E.D.N.Y. Nov. 27, 2017) (breach of warranty claim dismissed because, *inter alia*, complaint did not describe where actionable statements were made); *Kyszenia v. Ricoh USA, Inc.*, No. 20 Civ. 2215 (AMD) (VMS), 2022 WL 326981, at *7 (E.D.N.Y. Feb. 3, 2022) (complaint dismissed where it did "not specify where or when the defendant made the claimed assurances"). On the other hand, it is not clear that it is a plausible inference that statements amounting to "I have" and "we grabbed" assert true ownership.

Be that as it may, the AC's pleading as to reliance is threadbare and, on that ground, requires dismissal of the express warranty claim. It states only that Antifun "relied on this

statement . . . in making payment for the pods." AC ¶ 43. But this statement is conclusory. It does not explain why Ruth's claim to owning the pods, as opposed to being able to secure them from another, was decisive to Antifun. To the contrary, the AC pleads that, before placing the unfilled orders, Mooney had ordered pods from Ruth understanding that Ruth was obtaining these from others.[11] *See Kyszenia*, 2022 WL 326981 at *7 (dismissing complaint where claim of reliance was conclusory and not specific to time of purchase); *Oden v. Bos. Sci. Corp.*, 330 F. Supp. 3d 877, 895 (E.D.N.Y. 2018) (inadequate to assert plaintiff's reliance on representations without "providing any underlying factual details concerning when, where and how such reliance arose").

The Court accordingly dismisses this claim.

### C.    Fraud Claims (Counts Three through Six)

The AC brings four counts sounding in fraud: Count Three, which, like the express warranty claim, alleges that Ruth fraudulently represented that he owned the pods; Count Four, which alleges that Ruth fraudulently represented that he was in good standing with his distributor; Count Five, which alleges that Ruth fraudulently misrepresented his authority to act on behalf of Wayne, and Count Six, which alleges that Ruth sent fraudulent bank statements to his distributor. AC ¶¶ 43–46. These are all brought against Ruth. Count Three states that it is also brought against Wayne.

---

[11] In June 2020, Ruth messaged Mooney that he had "plenty of Mango at the warehouse," but "[e]verything but Mango is *direct from the distributor*." AC, Ex. 5 at 1 (emphasis added). Antifun still placed an order, *id.*, and Ruth and Mooney continued to transact business thereafter, through the end of 2020. *See id.*, Exs. 6 (messages about unspecified order shipment in October 2020), 7 (messages about unspecified order shipment in September 2020). Throughout their business relationship, Ruth repeatedly referred to distributors from whom he obtained his stock. *See, e.g.*, AC ¶¶ 12–14; *id.*, Exs. 5 at 2, 8 at 3.

Defendants argues that the fraud claims should all be dismissed because (1) they are not pled with sufficient particularity, as required under Rule 9(b); (2) they duplicate the breach of contract claim; (3) a claim of a fraudulent omission fails absent any duty to disclose; and (4) Antifun fails to specify the fraud allocable to each defendant.  Mem. 13–19.  Defendants' first critique is correct.  The Court dismisses the AC's four fraud claims on that grounds, and does not reach defendants' remaining arguments.

### 1.    Particularity

Under New York law, to state a claim for fraud, a plaintiff must allege facts showing "that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance."  *Eternity Glob. Master Fund Ltd.*, 375 F.3d at 186–87 (quoting *Banque Arabe et Int'l D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995)).  A fraud claim in federal court must also satisfy Rule 9(b), which, as noted, requires the complaint to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Frei v. Taro Pharms. U.S.A., Inc.*, 443 F. Supp. 3d 456, 470 (S.D.N.Y. 2020) (quoting *Lerner*, 459 F.3d at 290), *aff'd*, 844 F. App'x 444 (2d Cir. 2021) (summary order).  A complaint must also plead "the manner in which [the plaintiff] was damaged by the implementation of a deceptive or manipulative practice or by a misrepresentation or omission."  *Id.* at 471; *Moran v. Kidder Peabody & Co.*, 609 F. Supp. 661, 665 (S.D.N.Y. 1985).

### 2.    Fraudulent Misrepresentation of Pod Ownership (Count Three)

The AC alleges that Ruth fraudulently represented that he owned pods when he did not

actually own them. AC ¶ 43.  For two reasons, these allegations are not pled with sufficient

particularity to state a claim.

First, Antifun claims, indistinctly, that this representation was made "prior to making

payment for the pods." *Id.*  The first payment at issue in this case was made on May 6, 2021,

more than a year after Antifun and Ruth started their relationship. *Id.*, Ex. 1 at 1, 2.  This time

range is too broad to satisfy Rule 9(b)'s requirement that the complaint allege "when the

statements were made." *Frei*, 443 F. Supp. 3d at 470; *see Jeff Isaac Rare Coins, Inc. v. Yaffe*,

792 F. Supp. 13, 15 (E.D.N.Y. 1992) ("early January of 1991" too approximate a date to satisfy

the Rule 9(b) pleading requirement); *Anwar v. Fairfield Greenwich Ltd.*, 826 F. Supp. 2d 578,

586 (S.D.N.Y. 2011) ("approximate time frame" is insufficient to meet "when" requirement

under Rule 9(b)); *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, No. 12 Civ. 5354

(KAM) (RLM), 2014 WL 1311979, at *5 (E.D.N.Y. Mar. 28, 2014) ("at some point between

May and June of 2011" was insufficient to meet 9(b) particularity requirements); *Lomaglio*

*Assocs. Inc. v. LBK Mktg. Corp.*, 876 F. Supp. 41, 44 (S.D.N.Y. 1995) (a "vague reference to a

period of several months does not sufficiently apprise Defendant of when the allegedly

fraudulent speech was made"); *Concorde Funds, Inv. v. Value Line, Inc.*, No. 04 Civ. 9932

(NRB), 2006 WL 522466, at *5 (S.D.N.Y. Mar. 2, 2006) (collecting cases) (lengthy timeframe

insufficient to satisfy Rule 9(b) requirements).

Second, Antifun does not plead *where* the statement was made, as Rule 9(b) requires.

*Anwar*, 826 F. Supp. 2d at 586 (failure to allege where statements were made prevented fair

notice to defendant); *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 101 (S.D.N.Y. 1997) (complaint

dismissed where plaintiff failed to allege details of where statements were made). Antifun does

not, for example, point to a WhatsApp message in which it contends Ruth made this statement.[12]

### 3.    Fraudulent Representation of Good Standing with MWT (Count Four)

The AC alleges that Ruth fraudulently represented that he was in good standing with the

distributor, MWT, by stating: "I can supply directly from the Juul distributor in either Russia or

Ukraine." AC ¶ 44. That statement, however, does not appear in any of the messages produced

in the exhibits. Without such support, it fails under Rule 9(b) because the AC does not allege

when or where the statement was made. *Weaver*, 172 F.R.D. at 101 (claim dismissed where

complaint failed to specify when and where statement was made); *Goldmark, Inc. v. Certain*

*Underwriters at Lloyd's London*, No. 05 Civ. 463 (FB) (RER), 2009 WL 10705786, at *4

(E.D.N.Y. June 8, 2009) (insufficient particularity where complaint did not specify time and

place of statements). At best, the complaint alleges, vaguely, that Ruth knew he was in default

with the distributor. AC ¶ 44 ("Mr. Ruth, knew at the time that he promised to deliver the pods

---

[12] Conceivably, Antifun means to refer to Ruth's WhatsApp message of June 9, 2020, in which he made a statement about pods he had in a "warehouse." AC, Ex. 5 at 1. But that statement did not clearly relate to either of the orders at issue, which were placed nearly a year later. And that statement does not speak clearly to *ownership* of the pods, which is the representation Antifun claims was false. AC ¶¶ 28, 43. As reflected in Exhibit 5, the full message conveys only that Ruth had Mango pods in his possession, and that the rest would need to be ordered from the distributor. *Id.*, Ex. 5 at 1. And even if the statement were read as a representation of Ruth's then-ownership, Antifun does not allege facts indicating that Ruth did not then own the pods. *Lee v. Lending Tree*, No. 06 Civ. 0827 (RJH) (JCF), 2006 WL 2927241, at *7 (S.D.N.Y. Sept. 29, 2006) (claim dismissed where plaintiff failed to plead why statements constituted fraud); *McStay v. I.C. Sys., Inc.*, 174 F. Supp. 2d 42, 48 (S.D.N.Y. 2001) (claim dismissed where pleadings failed "to allege particularized facts as to how [defendant]'s statements were false or misleading"), *aff'd*, 308 F.3d 188 (2d Cir. 2002).

that Wayne Industries was . . . in default[.]"). That, however, does not place the statement at a specific moment in time.[13]

### 4.    Fraudulent Representation of Relationship with Wayne (Count Five)

The AC alleges that Ruth "misrepresented his authority to act on behalf of Wayne Industries." *Id.* ¶ 45. But it does not allege what statement constituted this misrepresentation, when or where the statement was made, or what made it fraudulent. To the extent the AC means to fault Ruth for not disclosing his relationship with Wayne, the AC fails under Rule 9(b), insofar as the rule "requires the movant to specify the context in which the omission was made and the manner in which it misled Plaintiff." *Weaver*, 172 F.R.D. at 101–02. And "[t]o identify the context in which the omission here was made and the manner in which it misled Plaintiff, Plaintiff would have to specifically identity the representations, advertisements, and promotional materials that . . . misled him, and upon which he relied." *Id.* at 102. The AC does not do so.

Independent of the Rule 9(b) deficiencies, the AC does not allege facts indicating that Antifun relied—or had reason to rely—on the fraudulent omission by Ruth of the fact that he was affiliated with Wayne. *Tuosto v. Philip Morris USA Inc.*, No. 05 Civ. 9384 (PKL), 2007 WL 2398507, at *9 (S.D.N.Y. Aug. 21, 2007); *Johnson v. Formula 1 Imports*, No. 11 Civ. 1720

---

[13] Two messages in exhibits attached to the AC remotely resemble the allegedly fraudulent representation. The first is: "I buy directly from Babylon and Vardex which are the official distributors and retailers for them in Russia." AC, Ex. 8 at 4. But that message was sent before Antifun placed the sample order; it was followed by other, filled orders, *id.* at 4, 8–10; AC ¶ 16 (Antifun placed orders before October 2020); and it is not pled to have any relationship to the orders in May and June 2021 that went unfilled. Moreover, the AC does not allege facts making that statement factually untrue. *Lerner*, 459 F.3d at 290 (complaint must allege facts showing why statement is fraudulent). The statement is also undated. For these reasons, construing the AC to plead that that statement was false would not satisfy Rule 9(b). The second statement is: "Everything but Mango is direct from the distributor so need to order that." AC, Ex. 5 at 1. Again, the AC does not allege facts making that statement false. It clearly does not contain a representation that Ruth can supply the pods. AC ¶ 44; *id.*, Ex. 5 at 1.

(NGG) (RLM), 2012 WL 628520, at *2 (E.D.N.Y. Feb. 24, 2012) (fraud claim dismissed

because Plaintiffs failed to allege reliance). That, separately, requires dismissal of this claim.

### 5.    Fraudulent Representation to Wayne's Distributor (Count Six)

In its final fraud claim, the AC alleges that Ruth sent false bank statements to his

supplier, MWT, hoping to induce it to continue sending pod shipments despite his pending debts.

AC ¶¶ 26, 46; *id.*, Ex. 4. Antifun claims that the fabricated statements falsely indicated that Ruth

had made payments against his debt. AC ¶¶ 26, 46; *id.*, Ex. 4. Antifun claims that Ruth's steps

to mislead MWT damaged Ruth's relationship with MWT and led MWT to stop sending pods to

Antifun. AC ¶ 46.

The AC, however, does not claim that Antifun, or anyone, relied on the false statements.

On the contrary, it alleges, MWT called the statements "ridiculous photos from the bank" that

Ruth used when he "tried to mislead [them]." *Id.*, Ex. 4 at 2. And even if MWT had relied on

the statements, a third-party's reliance is insufficient to establish the reliance element. *See*

*Pasternack v. Lab'y Corp. of Am. Holdings*, 59 N.E.3d 485, 493 (N.Y. 2016) ("[T]he tort of

fraud is intended to protect a party from being induced to act or refrain from acting based on

false representations . . . which does not occur where . . . misrepresentations were not

communicated to, or relied on, by plaintiff. We . . . decline to extend the reliance element of

fraud to include a claim based on the reliance of a third party, rather than the plaintiff."); *Abbott*

*Lab'ys v. Adelphia Supply USA*, No. 15 Civ. 5826 (CBA) (LB), 2019 WL 5696148, at *36

(E.D.N.Y. Sept. 30, 2019). Whatever evidentiary value Ruth's fabrication of documents might

have in fortifying other claim(s), the AC fails to state a claim for fraud based on Ruth's

submission of a doctored document to MWT.

The Court, accordingly, dismisses all four of the AC's fraud claims.

### D.     Unjust Enrichment Claim (Count Seven)

Defendants, finally, argue that the unjust enrichment claim is duplicative of the breach of contract claim and therefore should be dismissed.  Mem. at 19–20.  Antifun counters that, at this early stage, it should be permitted to pursue the unjust enrichment claim as the alternative to breach of contract.  Antifun is correct.

To state a claim for unjust enrichment under New York law, a plaintiff must allege: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)).  "[T]he theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties." *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (internal quotation marks omitted).

Unjust enrichment cannot survive if it simply duplicates a contract claim.  *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 430 (S.D.N.Y. 2021) ("[C]ourts in this District have previously dismissed unjust enrichment claims that were indistinguishable from contract claims pleaded in the alternative . . . at least where the parties did not dispute that they shared a contractual relationship."); *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012).  But where the parties dispute the existence of a contract, a plaintiff may plead quasi-contract theories in the alternative, even though, in the end, it will not be permitted to recover on both claims.  *See* Fed. R. Civ. P. 8(a)(3).  Here, the parties centrally dispute whether a contract was formed.  And the Court has sustained the AC's breach of contract claim, which will now proceed to discovery.  As such, with the fate of the breach of contract claim indeterminate, Antifun is entitled to pursue the unjust enrichment claim in the alternative.  The Court therefore denies the motion to dismiss that claim.  *See, e.g.*, *H.Daya Int'l Co. v. Arazi*, 348 F. Supp. 3d 304, 312 n.6

(S.D.N.Y. 2018) (court dismissed unjust enrichment claim only after defendants were found liable for breach of contract); *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 519 (S.D.N.Y. 2015) (unjust enrichment "may be pled as an alternative to a breach of contract claim" (citation omitted)); *Trend & Style Asia HK Co. v. Pac. Worldwide, Inc.*, No. 14 Civ. 992 (SAS), 2015 WL 4190746, at \*5 (S.D.N.Y. July 10, 2015) ("[T]he Rules expressly permit plaintiffs to plead" unjust enrichment "in the alternative" to breach of contract, "and the law is well settled in this regard."); *Singer v. Xipto Inc.*, 852 F. Supp. 2d 416, 426 (S.D.N.Y. 2012) ("While a party generally may not simultaneously recover upon a breach of contract and unjust enrichment claim arising from the same facts, it is still permissible to plead such claims as alternative theories."); *Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P.*, No. 08 Civ. 10578 (RJS), 2010 WL 1257326, at \*9 (S.D.N.Y. 2010) ("[W]here Defendants dispute the existence of a valid, enforceable contract, Plaintiffs are permitted to proceed on both contractual and quasi-contractual theories."); *Ford v. Rensselaer Polytechnic Inst.*, 507 F. Supp. 3d 406, 419 (N.D.N.Y. 2020).

## CONCLUSION

For the foregoing reasons, the Court grants the motion to dismiss the AC's breach of express warranty and fraud claims, but denies the motion to dismiss the breach of contract and unjust enrichment claims. The Clerk of Court is respectfully directed to terminate the motion pending at Dkts. 11 and 18.

Defendants are ordered, by August 5, 2022 to file an answer to the surviving claims. The Court will shortly issue a separate order scheduling an initial pretrial conference.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: July 22, 2022
       New York, New York